Mr. Moran good morning to you. Welcome to the court. We'd like to proceed as soon as you can be ready. Now, sir, on the filings, there's no gray brief filed, is that right? No reply brief? No, your honor. Okay, that's fine. I just wanted to make sure I wasn't missing something that I would need. Please proceed. Thank you, your honors. Good morning, and may it please the court. My name is Philip D. Moran, and I represent the petition of David H. Whelan. As your honors know, this matter was before Administrative Judge Michael T. Rudisill on the issues of whether the respondent agency proved the charge of falsification by preponderant evidence. But the decision before us is by the full board of the three presidentially appointed members, so that's what you have to show contains reversible error. That's what I intend, I hope to do, your honor. Why is there no transcript? Is that because of cost? I'm not sure why there's no transcript. Wherein is the reversible error? The reversible error, your honor, is that the review board failed to look at the evidence which Judge Rudisill had the two days of opportunity to look at. Wait a minute. What makes you conclude that they failed to look at the evidence? They wrote an opinion? They had the whole record in front of them? Your honor, they didn't have the opportunity to observe the witnesses. Well, that's always the case. The three members of the board never see the witnesses live. They always are operating off of a documentary record, just the way we do. I understand that, your honor, but basically they're operating in a vacuum. In this particular case, there were basically three essential witnesses to this case. But your case has to be that the credibility assessments of the testimony of live witnesses by the administrative judge were all correct and should stand. That's correct, your honor. Okay. But I don't see anywhere in this full board decision where any demeanor-based credibility assessments are altered. So where's there a problem that they didn't see the witnesses' faces as they testified? The problem, your honor, was that the two witnesses, the two special agents for the service, when they interviewed my client during that interview on St. Patrick's Day in 2005, they failed to list in the final statement, which my client unfortunately signed, they failed to put in substantial exculpatory evidence. That's clearly true. That's clearly true. We can see that because we can compare the notes with the statement. But the full board had the notes and the statement and the testimony of your client as to what he recalls transpired during the interview. So how is it that they were missing some evidence? I don't follow you. They missed the fact that I guess the best way to describe it is when Judge Rudisill saw what he was looking at, Agent Powers was basically described – could best be described as a deer in the headlights. This agent, your honor, when he was trying to explain why he failed to put in the exculpatory evidence, just totally fell apart. He was unable to do so, and Judge Rudisill picked it up. I believe Judge Rudisill – A broad rejection of the agent's testimony is incredible, and I don't find any variance by the board as to credibility. The A.J. said that it was inexplicable how they left out the exculpatory evidence. Yeah, I understand that. Well, that was the whole – that's basically the whole case, your honor, that my client was interviewed for several hours by these two individuals. They took a statement. They wrote out the statement. He scanned it. He said it was the worst day of his life. He simply wanted to get out of there and go home. He signed a statement, which he shouldn't have. But then that whole – the whole case is based on it. Without that signed statement, we wouldn't be here today. When Judge Rudisill had the opportunity – well, first of all, I never saw the notes as counsel. I asked for a production of documents. I never saw the notes until just before the trial. When I saw the trial notes, I think I referred in my brief, it's a deus ex machina. It was like a rival association. You're going way too fast for me. Okay. I'm trying to figure out exactly what you think the full board did that requires reversal. That's the only question in front of us. They did not take into account the fact that, as Judge Rudisill said, and I quote, they inexplicably did not include in the final sworn statement information that I find goes directly to the issue of whether the appellant intended to lead or mislead or deceive the agency. Isn't the issue here that – I mean, clearly it is intense. And the administrative judge evaluated it subjectively and said, yay, factually he misstated these things, but he didn't do it with a subjective intent to cause harm or to deceive them, and that the board said, well, objectively, factually, there was an intent to deceive. And so doesn't it really depend on which standard to be used? I suppose that's true, Your Honor. But the point is that I guess I go back to the fact that Judge Rudisill had the opportunity to observe these three witnesses, to watch their demeanor, and to decide whether or not there was an intent to deceive. The intent is – I submit that the intent to deceive here was not by my client, Mr. Whelan, but by the two special agents who intended to deceive everyone by leaving out all of the exculpatory evidence. I think – Mr. Moran, he found them – he found there was no coercion here. I don't think this is a case that turns on credibility. Isn't it really more – didn't really – isn't really what we have here the situation that Judge Bucklow just described? The board said – the A.J. said they didn't prove their case with respect to this charge by the preponderance of the evidence because he felt some exculpatory statements relating to motive should have been in the final statement. The board looked at it and said – they didn't specifically say, but thinking that this isn't a credibility case, they just looked at it and said there is a preponderance of the evidence here. He admitted doing it. But I think there is a credibility case here, Your Honor, and I think that's the point. I think under Weaver, which quotes the universal camera case, you have to go back to give some credibility to the A.J. But what about the statements of the A.J. favorable to the credibility of the agents? He said that they were – he believed them with respect to the fact that there was no coercion and that they – How did that harm him? The exculpatory evidence came forward for both the A.J. and the three-member board on review. So the full content of what he told the agents as reflected in their notes was before all of those adjudicators. So how is there any harm that the formal signed statement didn't also include those explanations? The harm was he was terminated because the people – But in contesting the termination, he had the benefit of documents that showed that right from the start he gave certain explanatory statements that tended to exculpate him. And that's why I believe Judge Rudisill was correct. Okay. But then where is the harm that those exculpatory statements weren't contained in the formal statement but only were in the form of the investigators' notes by the time we got to the trial in front of the administrative judge? How is there any harm in that? He lost his job. How much more harm can he have? But you weren't handicapped in proving that he had from the start given exculpatory explanations. And I prove that to Judge Rudisill's satisfaction, and that's why we believe that we should leave Judge Rudisill's decision, which I submit is a very judicious decision. He didn't terminate my client. He didn't put him back in the supervisory role. He demoted him to a postal – a letter carrier, which my client is very happy to accept. He's not saying that he was blameless, but he believes that the punishment here didn't fit the crime, so to speak, and that he was not treated – Well, he found that the principal charge had not been proven and that based on the lesser of the two charges, which he found was proven, removal would be an excessive penalty. But then when the board found to the contrary that the more serious charge, falsification, was also proven, then that restored the predicate for the harsher penalty of removal. So it seems to me you're going to have a very hard time winning with respect to the penalty being excessively harsh unless you can show that the board was committing an error in concluding that Mr. Whelan's doctoring, I'll call it, of the time records of the various subordinates was against the evidence. Well, I believe it was. How can it be against the evidence when Ms. Tavernese spoke of 185 times when her time cards were altered by your client? No, that's not true, Your Honor. Ms. Tavernese said that her time – the government said that her time charge was changed 206 times, 103 by Ms. Nigro, 91 to either 97 by Mr. Page, and either 10 or 12 by my client. So that – and this is where I believe the penalty is totally excessive because – No, I understood that the 10 to 12 had to do with Ms. Oakes. They did. I'm talking about Ms. Tavernese. I am talking about Ms. Tavernese also. There were 206 times, I believe. There were 103 by Ms. Nigro. There was either 90 or 97 by Ms. Page. So therefore, if my arithmetic is right, that means that my client changed the time either 6 times or 13 times. All right. So – and Ms. Nigro was never disciplined. Mr. Page is still working there. Ms. Tavernese was promoted as a result of that judgment. Well, what does any of that have to do with whether the board's assessment of the evidence was erroneous? Well, I think Judge Nordesel again took all of this into consideration with the totality of the circumstances. Yeah, yeah, but the structure of this adjudicatory system empowers the board to overrule an administrative judge, including to find historical facts differently on the same evidentiary record than the administrative judge found. That's the way Congress set up the system. So they clearly were acting within their powers when they made a different determination on the issue of intent. So unless you can show that there was something that they did that just was irrational based on this evidence, it seems to me you have a very hard time prevailing here. I don't disagree with what you just said, Your Honor, except in the Jackson case, the court does say that you have to go back to give credibility to the administrative judge who actually saw the demeanor of Congress. The board doesn't depart on any credibility grounds from what Rudisill found. The board accepts all of what Rudisill found except the analytic step of determining inferences as to knowledge and intent. But that has nothing to do with the credibility of live testimony of various witnesses. That's a matter of legal analysis of evidence on the record. I may respectfully disagree. I think Rudisill found, based on the fact that he believed that the special agents intended to deceive everyone by leaving out the exculpatory evidence, that my client, who said in the pots they left out were, I never intended to deceive anyone. I never gave anybody money for not working.  Mr. Moran, assume for the moment that there was that intent, the intent to hide that evidence. It was frustrated because both the A.J. and the board had before them, first of all, the signed statement and second, the notes. So as Chief Judge Michel said earlier, I guess a couple minutes ago, everything that one needed to assess the facts in the case was before the deciders, namely the A.J. and then the board. It's not a case where some evidence was destroyed. It just, it was in places A and B instead of all in A. I understand that, Your Honor, but looking at, if I may just for a moment, equate this to the Duke lacrosse team. Mr. Niefold, his evidence, so did his DNA expert. It was found, but that didn't change the fact that those gentlemen were punished for over a year. My client has been punished for two years now by not having a job. Well, the difference there was you had evidence that was totally exculpatory. Here, there was never, for any period of time, any evidence that was hidden. Oh, it was hidden until 11 days before the trial. We never saw that evidence. In fact, if Mr. Rogers… Well, it was there before the board and the A.J. But the A.J. took it into consideration. I'm saying that the board totally ignored the intent to deceive on the part of the special agents, which the board, which Judge Rotorcell didn't. And I think Judge Rotorcell looked at it correctly, and I don't think the board did. All right, let's hear from the government, and we'll restore two minutes for you for rebuttal because your time is actually all expired. Thank you. Mr. Hyde. Welcome to you. Thank you. May it please the Court. There are two, not one sworn statement at issue here today. And the first statement we've discussed at length today, that's Mr. Whalen's. The second statement, though, belongs to Ms. Tabernasi. And I think it's – we think it's important to recognize that those two statements together constitute substantial evidence that would – should affirm the board's decision. You better help me out understanding how this system works, this timekeeping system. As I understand it, people got paid – this group of subordinates of Mr. Whalen got paid based on how many hours they actually worked. This is correct. And therefore, if he added hours, inflated the number of hours on a given day compared to the number of hours actually worked, then those postal employees would have been paid more money than if the hours had been accurately reported. I believe that's correct, that a route, a mail carrier's route is given a lot of time, whether it is – But that's a prediction, right? It is what it is in terms of what the postal service – Well, that's what I'm asking you. I'm asking you to explain how pay is calibrated so we can understand what really happened here. Why did they want to fire him? Why did they want to fire Mr. Whalen? Mr. Whalen falsified time records. Yeah, but what was the injury that came from falsifying the time records? Well, the injury is that the agency was having someone in a supervisory position who was knowingly supplying incorrect information. Was there any monetary consequence? Well, yes, there is a monetary consequence if you have someone who is not working but getting paid for that work. Well, that's what I was asking before, whether they got paid more than they were due because he put them down, let's say, for 10 hours, even though they only actually worked for 8 hours on the day in question. That's correct. And did – or did they even look at it? I guess we don't know. I mean, did other people do the same route or the same length of time and actually spend 10 hours or whatever it was? I guess we shouldn't use the 10 because then we're talking about overtime, but say 8 hours instead of 6? From what I understand – from what we understand from the record, the accepted practice includes like an hour to take for mealtime and for breaks. And when you are assigned a route, that route is given a time. So somebody finished it early because they didn't take mealtime or break? Is that what he's being punished for? No. Again, he's being punished for supplying incorrect, false information. But that goes to intent, right? Yes. I mean, if he said, gee, okay, you raced through it because you want to get home to your kid and so you spent 7 hours instead of 8 like everybody else does and you didn't take a break, I'm going to give you credit for 8 hours. Technically that's false. But if you were looking at intent and motivation, could you say he's wrong? Well, I would say that he's wrong. We would say that he's wrong. The reputed purity of the motive is irrelevant. The fact is he was on several occasions entering false information into the system. Do we know the specifics of the false information? How many hours of unworked time people were paid for because of entries he made in this computer timekeeping system? Well, we do know from Ms. Tabernasi's sworn statement that there were 187 instances where she received... Yeah, but Mr. Moran said nearly all of them were by two other supervisors. The only respondent here is Whelan, so let's not worry about the other two. It's hard enough to figure out what should happen to Whelan. Well, that's actually an inaccurate characterization for two reasons. The first being that it's also, this is in Mr. Whelan's statement, he admits to going on to taking passwords from other supervisors to enter time in for people such as Ms. Oaks and Ms. Tabernasi and Mr. Hoffman. So the suggestion that the identification of Ms. Nigro or other supervisors as the people who were inputting overtime improperly is untrue. I mean, that's just what the computer would show, that in a case where Whelan used Nigro's name to add hours to my workday, the computer would say Nigro did it, but in fact, from the other testimony, we know that Whelan did. And secondly, to your point, Ms. Tabernasi testifies that she admits that there were 187 instances where she was given the benefit, and she said that she also testified... When you say she testified, did she testify live at the hearing? I'm sorry, that's a misuse of the word. In her sworn declaration, she states that this relationship was an, quote, arrangement that she only had with Mr. Whelan, and that it became a habit, and that, so that also goes to the point that no one else... Did either of the other two supervisors testify at the hearing, live testimony? I believe that Ms. Nigro did testify at the hearing, and Ms. Nigro stated that any time she noticed that... Is there a transcript of the hearing? There is no transcript of the hearing. Well, there is no transcript of the hearing. Why didn't the government order one? It's not the government's obligation to order a transcript. Well, it's the government's obligation to understand the facts of the case so that you can make representations to this court that are sound. Absolutely. Well, how can you do that if you don't have any documents of what happened at the trial? How can you appeal to a board without a transcript? Then they didn't have everything. They had the hearing tapes, which if you look at the board's decision, that they do refer to the hearing tapes. Did you get the hearing tapes? We have the hearing tapes at our offices. Have you listened to them? No, we have not. Don't you think it would be a good idea in preparing the case so that you know what the testimony was? The record is presented to us. The brief is presented to us. We determined that we were comfortable with the record as it stood. How can you be comfortable with a record when you haven't reviewed the record because you didn't listen to the tapes? You're saying, Mr. Harvey, you frame whether you have to listen to the tapes by the contentions that are made. There was no indication in the briefs that anyone else had listened to the tapes or presented a transcript on the other side. That's correct, Your Honor. In fact, it's an argument that we do make in our brief that any reliance or characterizations of the hearing really should be discounted because no transcript has been provided and no specific reference to the transcript has been provided by the other side. Is there a way, by the way, this is a man who has lost his job. Is there something, a way by which he can request a transcript at no cost? I believe if he had requested the transcript in the form of papyrus, he would have been able to receive the transcript. What is the standard of intent here? How specific does the intent have to be? Does it have to be that I, Whelan, intended to cheat the taxpayers and the government out of money by falsifying the time cards of my subordinate, Mr. Shaw? Or does it just have to be I knew I was falsifying the records and it doesn't matter whether it involved taxpayer money or not? Well, what is the right standard here? It's knowing. It's knowledge. Well, what's your basis of saying knowing is the right standard rather than intent to deceive, intent to defraud, or some alternative? That is the language that's been defined for falsification, which is knowingly supplying incorrect information. Well, where does the falsification charge come from? Is that in the postal manual or somewhere? Falsification is a... It's a charge, and I'm asking you where it comes from. Well, it is a specific charge that was referenced in the notice of removal, and it is, there is a... Where is it written down, the charge of falsification? Where is that written down and what is the language of it? It is written in the notice of removal of the supplemental appendix. I'm not worried about what Ms. Kelly wrote in her letter. I'm worried about what the underlying document says. The underlying document that contains the charge of falsification and gives us the standard of intent that relates to that charge. Your Honor, I'm not sure that I understand your question. Are you asking for... I'm sorry. It's the key, I suppose. You know, what intent? Well, the intent... Where does it come from? I'm asking you, if this were a crime, I'm asking you what section of the penal code, what section of Title 18 contains the crime that's in this case? And you're telling me, well, it's referenced in the letter of the deciding official, Ms. Kelly. That's not a responsive answer. The responsive answer is, where is it written down in the postal manual or the bargaining, the collective bargaining agreement or some other document that binds Mr. Whalen and everybody else like him? In section 665.44, which is referenced in the Notice of Proposed Removal of the Supplemental Appendix on page 3... That section is in what? That section is in the Employee and Labor Relations Manual, Code of Federal Regulations. So it's a CFR site? It sort of sounds like a garble. An employee manual would be one thing, and the Code of Federal Regulations is a different thing. At least I would suppose it would be two different things, so I'm not even sure what you're saying. We are saying that the provision for falsification is found in the Employee and Labor Relations Manual, and that's referred to as section 665.44, which falsification and reporting, which states in part, reporting the time of another employee constitutes falsification of a report. Any employee who knowingly involves such a procedure is subject to removal or other discipline. Now, where is the standard on intent? That was the question. We're trying to locate in some documentary source what degree or type of bad intent someone has to have to be in violation of the prohibition against falsifying time records. What I understand you to be saying, Mr. Hybee, is that there's no element of intent. The only element of intent is do you intend to falsify a document, whatever your motive are, whether they're motives of a good Samaritan or motives to try and get government for the money. The Act is falsifying the document. If you intend to falsify the document, that's enough. We don't look to motive. That's correct. Or if you knowingly. In other words, you're saying knowingly is the same thing as an intention. That is correct. Now, the prohibition is against somebody else doing the time for a given employee, somebody other than that employee. Correct. So you would then argue that Mr. Whalen knew that he wasn't Miss Tavernese. So when he puts in her time, he knows he's not her. And therefore, right away, he's in knowing violation of the cited section. Yes, Your Honor, that's correct. Now, what about the penalty? This penalty of removal is certainly proportionate to the offense. In fact, this court in Beverly v. United States Postal Service removed a postal supervisor who called in sick for one day when she was not sick. And the board has also affirmed in Cronk v. U.S. Postal Service the removal of an employee who falsely claimed to have worked two more hours than he actually worked. And in Martinez v. Department of Defense, the board affirmed the removal of a supervisory employee who submitted a false travel voucher for $84. So in this case, whether Mr. Whalen has falsified records 6 to 12 times, 187 times, or just one time, the agency has reasonably determined that removal… Did he alter his own records, his own time records? In his statement, he says that he did. That was not developed. Okay, so the charge that was the basis of the removal was his entering time records for various subordinates, such as Ms. Oaks or Ms. Tavernese or others. For the falsification charge, that is correct. But it's automatically falsification, as I understand you, that he does it rather than them doing it, even if the hours are accurate. Is that right? That would be correct, Your Honor. But the hours in this case are not accurate. So sort of two different forms of falsification. Wrong person entered the time record and inflated the number to show more hours of labor than were actually performed. Is that right? Yes, Your Honor. And if Mr. Whalen had done what the other supervisor had done, which is Ms. Nigro, and had reported immediately that he was going to enter someone's time for them because a person was at a rescue or there was a certain emergency, then… Is that in the record? That's Ms. Nigro's testimony, which is cited in the board's decision. But that's not testimony you've ever listened to. That is correct. Or read. So you really don't know what it says. You're just quoting the board's decision to us. But that was never put in issue. No. Anything further? No, Your Honor. All right, thank you, Mr. Hybee. Mr. Moran, two minutes. Thank you, Your Honor. Just briefly, with respect to Mr. Hybee's specific charge that Ms. Whalen had changed Ms. Nigro's time, Ms. Nigro, it's categorically clear that she was the one who changed the time or put in the time, 103 of the 206 or 187 times, depending on… Judge Rudisill, in his decision, says, I specifically find, however, the agency has failed to prove by preponderant evidence that part of the narrative charge pertaining to the appellant's alleged use of Nancy Nigro's tax password to gain access to the system for purposes of adding clock runs. Ms. Nigro testified she never shared her password with anyone and there was no other evidence that the appellant had access to Ms. Nigro's password. Thus, that part of the agency's charge fails for lack of proof. Mr. Hybee seems this morning to be arguing that the most important thing here was Ms. Nigro's testimony on the fact that maybe Mr. Whalen had gone in and used her password. It's clear from Judge Rudisill that the evidence was clear. He specifically finds against that. So that's not even before you. I would simply say that you'd have to look, with respect to your question on intent, at the elements of deceit under the common law, one of which is that someone has to be harmed. There is absolutely no evidence before this court, there is no evidence before anyone, that anybody was harmed by what Mr. Whalen did. You're talking about common law fraud? Common law fraud. Yeah, but this – I'm not sure you – it's sound to suggest that this provision against falsifying records or doing records for a different person equates with common law fraud. Well, they call it deceit, and my recollection is that's what deceit is. It's common law fraud. I thought they called it falsification. Well, I believe they said that he misled and deceived the agency, and therefore, by falsifying the records, he was misleading and deceiving the agency. That's in Ms. Kelly's letter. Yes, and that was deceit. And I say if you're going to call it deceit, then you have to call it what it is, and that is you have to show some harm. They didn't do that. What's wrong with Judge Bucklow's suggestion that knowing is the sort of intent that's implicit here? I guess, again, even if it is knowing, you still have to show some – if knowingly is equivalent to deceit, then I say you have to show some harm. Well, he knows he's not Ms. Oaks, so when he enters her departure time at the end of a day of work, he knows that he's breaking the rules of the timekeeping system, where everybody's supposed to enter their own departure time, not have it done for them by anyone else, including their supervisor. But he explained to Judge Rudder's satisfaction why he added that time. He said that she went out on a rescue, and therefore, he put her time in because she was out of time. Isn't that the issue, though? Your opponent says knowing is enough, and that's – he says you don't really have to have an intent to defraud the agency. We just want to know where we should look for the proper standard. I would say you have to show intent, Your Honor, and I respectfully request that you do show intent. I would respectfully request that you overrule the board and reinstate Judge Rudder. So let Mr. Whalum go back, not as a supervisor, but as a good postal employee. He worked for eight years, never missed a day of work. I believe the penalty here was far excessive. He was a scapegoat. There were five people involved in this. One retired, the postmaster. The other three are still working. They've never been disciplined, and Mr. Whalum was the scapegoat here, and he's the one – he got fired. I think it's far excessive, and I think in the Jackson case, which was before this court, they held that demotion was a more appropriate penalty than termination, and I would respectfully ask that you do that. All right. Thank you both. We'll take the appeal under advisement.